IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 13-cv-02556-RM-KLM

JOE DEHERRERA, JOE GRIEGO,
JENNIFER JOHNSON, SCOTT JOHNSON, and
TOM LARK, on behalf of themselves, individually,
and on behalf of all others similarly situated,

      Plaintiffs,

v.

DECKER TRUCK LINE, INC.

      Defendant.

_____

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

_____

    Defendant Decker Truck Line, Inc. ("Decker"), by and through its undersigned counsel and pursuant to Fed. R. Civ. P. 56, hereby submits this Motion for Summary Judgment.

## INTRODUCTION

    Plaintiffs assert two claims for relief: one under the Fair Labor Standards Act ("FLSA" or the "Act") and one under Colorado state law.  In support of their FLSA claim, Plaintiffs assert that they are (or were) non-exempt employees of Decker who have not been paid "at time-and-a-half their straight time wages for all work performed over 40 hours per work week."  Am. Compl. ¶ 38.  Plaintiffs also allege that they have not been properly paid for all work "at their straight time rate for work under and up to 40 hours of work per work week."  Id.  In support of their state law claim, Plaintiffs assert that, in violation of Colorado's Minimum Wage Order, they have not been paid for all time worked, including overtime, and they have not been provided with 10-

minute rest breaks every four hours.  Id. at ¶¶ 45–47.  Given the undisputed facts and the applicable law, both claims must be dismissed.

Plaintiffs are (or were) employed by Decker to drive commercial motor vehicles in interstate commerce, bringing them within the scope of the FLSA's "motor carrier exemption." As a result of this exemption, Plaintiffs are not entitled to any premium wage payments for any overtime work, and their claim for unpaid overtime under the FLSA must be dismissed.  Id.  In addition, Plaintiffs' claim for unpaid wages "at their straight time rate for work under and up to 40 hours of work per work week" is a so-called "gap time" claim, which is not cognizable under the FLSA.   Indeed, as explained further below, Plaintiffs are estopped from asserting any claims under the FLSA.

Plaintiffs' state law claim also must be dismissed because Decker is not covered by Colorado's Minimum Wage Order.  The Order does not apply to businesses like Decker. Accordingly, Plaintiffs cannot assert their wage claim under state law.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to this Court's Civil Practice Standards, a separate statement of undisputed material facts is attached to this Motion as Exhibit A.

## ARGUMENT

**I.      Legal Standard.**

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Although the record is viewed "in the light most favorable to the nonmoving party," Berry v. T-Mobile USA, Inc., 490 F.3d 1211, 1216 (10th Cir. 2007), in order to survive summary judgment, the nonmoving party "must come forward with 'specific facts showing that there is a genuine issue

for trial.'" <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  A factual issue is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  <u>Anderson v. Liberty Lobby</u>, 477 U.S. 242, 248 (1986).  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 324 (1986).

**II.     Plaintiffs' FLSA Claim Must Be Dismissed Because Plaintiffs Are Not Covered by the FLSA.**

**A.  Applicable Law.**

The FLSA does not apply to employees for whom "the Secretary of Transportation has power to establish qualifications and maximum hours of service."  <u>See</u> 29 U.S.C. § 213(b)(1). An employee "of a private motor carrier is subject to regulation by the Secretary of Transportation, and therefore exempt from the FLSA," if the employee (1) "moves goods in interstate commerce" and (2) "affects the safe operation of motor vehicles on public highways." <u>See</u> <u>Foxworthy v. Hiland Dairy Co.</u>, 997 F.2d 670, 672 (10th Cir. 1993).

Transportation of merchandise within a single state may be deemed "interstate" in nature when it forms a part of a "practical continuity of movement" across state lines.  <u>Id</u>.  Whether such continuity exists depends upon the "essential character" of the shipment, and "[c]rucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment." <u>Id</u>. (citations and quotation marks omitted).  If the shipper has a "fixed and persisting intent to have the shipment continue in interstate commerce to its ultimate destination . . . [then] the interstate character of the traffic is not changed simply because the merchandise may move through a warehouse or terminal facility on the way to its ultimate [out-of-state] destination."  Surface Transportation Board Policy Statement, Ex-Parte No. MC-207, 1992 WL 122949 (April 27, 1992).  In other words, "[w]here a distribution center or warehouse

3

serves only as temporary storage to permit orderly and convenient transfer of goods in the course of what the shipper intends to be a continuous movement to [an interstate] destination, the continuity of the movement is not broken at the warehouse." Id.

The following factors, among others, are evidence that intrastate transportation of goods to a warehouse is part of interstate commerce, and hence subject to regulation by the Secretary of Transportation: (1) even if the shipper does not know the ultimate destination of specific shipments made to a warehouse, it "bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis," and "[t]he factual basis for projecting customer demand may include . . . historic sales . . ., actual present orders, [or] relevant market surveys;" (2) no further processing or substantial product modification occurs at the warehouse, although repackaging or reconfiguring may be performed; (3) while in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation; and (4) "[m]odern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse." Id. (also noting that a change in motor carriers after delivery to warehouse does not change the interstate character of initial transportation to warehouse). See also Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217 , 223–24 (2d. Cir. 2002) ("Whether the transportation is of an interstate nature can be determined by reference to the intended final destination of the transportation when that ultimate destination was envisaged at the time the transportation was commenced."); 29 C.F.R. § 782.7(b)(1) (interstate commerce requirement satisfied  "where the vehicles do not actually cross state lines but operate solely within a single state, if what is being transported is actually moving

in interstate commerce[,] . . . [and] the fact that other carriers transport it out of or into the state is not material.").

**B.  Plaintiffs Are Exempt Employees Under the FLSA's Motor Carrier Exemption.**

Plaintiffs are all commercial truck drivers with commercial drivers' licenses, who are – or have been – employed by Decker to drive commercial motor vehicles in interstate commerce. They each allege that they should be classified as non-exempt employees under the FLSA, and that Decker has "improperly and uniformly" treated them as exempt from the FLSA's requirements under the Act's motor carrier exemption.  Am. Compl. at ¶¶ 13–15.  The undisputed facts and the applicable law establish, however, that Plaintiffs *are* exempt employees who fall within the FLSA's motor carrier exemption.

Decker is a for-hire motor carrier regulated by the United States Department of Transportation, with its principal offices located in Fort Dodge, Iowa.  See Defendant's Statement of Undisputed Material Facts, attached hereto as Exhibit A (hereinafter "SOF") at ¶ 1. Decker has a transportation contract with New Belgium Brewing Co. ("New Belgium"), which owns a brewery and leases a warehouse in Fort Collins, Colorado.  Id. at ¶ 2.  New Belgium's warehouse is located close to Fort Collins' Horsetooth Reservoir, and it is commonly referred to as "the Rez."  Id. at ¶ 3.  The brewery and the Rez are located approximately five miles apart.  Id. at ¶ 4.

Pursuant to Decker's contract with New Belgium, truck drivers employed by Decker (such as Plaintiffs ) transport beer produced at the New Belgium brewery to the Rez and, pursuant to the contract, Decker is obligated to maintain certain safety ratings established by the United States Department of Transportation; it also must comply with rules promulgated by the Department of Transportation's Federal Motor Carrier Safety Administration.  Id. at ¶¶ 5, 8.

Thus, in accordance with Department of Transportation regulations, truck drivers employed by Decker under the New Belgium contract must maintain valid commercial drivers' licenses and conduct pre-trip safety inspections, which involves inspecting the outside of the vehicle and checking other items listed on a pre-trip inspection checklist.  Id. at ¶ 9.

On average, the beer shipped to the Rez by Decker's employees remains at the Rez for two weeks before it is shipped out to various interstate and intrastate destinations.  See SOF at ¶ 12–13.  Sometimes, however, Decker's truck drivers must ship beer to the Rez for an outbound, over-the road truck waiting at the Rez's loading dock and, when this occurs, beer is off-loaded from the Decker truck, scanned into the Rez's inventory, and then immediately loaded onto the outbound, over-the road truck for further delivery to interstate or intrastate destinations.  Id. at ¶ 14.

Decker's drivers not only deliver beer to the Rez, they also "back haul" empty kegs, pallets, cardboard packing materials, and hops from the Rez to the New Belgium brewery.  See SOF at ¶ 6.  Most of these empty kegs, pallets, and packaging materials are transported to the Rez from locations outside the state.  Id. at ¶ 7.

New Belgium has modern systems that allow for the tracking and documentation of most, if not all, of the shipments coming into and going out of the Rez.  See SOF at ¶ 15.  Specifically, New Belgium keeps track of products shipped to and from the Rez, and where products are stored in the Rez, using warehouse management software and the "license plates" that are on each pallet of beer (i.e., each license plate has an individualized barcode that identifies the product on the pallet, and the license plate and warehouse management software operate together to determine where a product should be, and is, located).  Id. at ¶ 16.

As of November 2013, approximately 86 percent of the beer transported by Decker employees from New Belgium's brewery to the Rez was subsequently shipped to locations outside the state of Colorado.  See SOF at ¶ 17.  Currently, 89 percent of the beer transported by Decker employees from New Belgium's brewery to the Rez is subsequently shipped to locations outside the state of Colorado.  Id.  In fact, New Belgium specifically intends for the beer shipped to the Rez to be shipped to additional locations, most of which are outside Colorado.  Id. at ¶ 18. The Rez, therefore, acts as temporary storage facility for product that is destined primarily for interstate locations.  Id. at ¶ 19.

New Belgium determines how much beer to ship to the Rez based on its projections of customer demand and actual beer on order.  See SOF at ¶ 20.  To forecast customer demand, New Belgium first calculates the maximum amount of beer that it could produce the following year (e.g., in early 2014, New Belgium calculated the maximum amount of beer that it could produce in 2015).  Id. at ¶ 21.  After calculating the maximum amount of beer that can be produced in the following year, New Belgium then predicts how much beer will be sold in given sales territories.  Id. at ¶ 22.  Most of New Belgium's sales territories are complete states, but some larger states have multiple sales territories (e.g., California is divided into a northern sales territory and a southern sales territory).  Id. at ¶ 23.  New Belgium then breaks down its forecasts further by predicting the particular New Belgium beer brands (e.g., Fat Tire, Ranger I.P.A., etc.) and sizes (e.g., 6-packs, 12-packs, kegs, etc.) that will be sold in each individual state market.  Id. at ¶ 24.  Given the mix of beer brands and sizes required by each state market, New Belgium then confirms whether and how it can arrange production to meet the forecasted sales.  Id. at ¶ 25.  New Belgium then creates monthly schedules showing what beers will be brewed and

packaged on each day of the month.  SOF at ¶ 26.  Because New Belgium demands that

distributors place their order 21 days in advance of shipping, New Belgium can then adjust and

fine-tune its production to meet demand for actual beer on order.  Id. at ¶ 27.

No further processing of beer occurs at the Rez, and there is no substantial modification

of the product at the warehouse.  See SOF at ¶ 28.   Once beer is shipped to the Rez by Decker

employees and is stored in the warehouse, New Belgium exercises control and direction over the

product's subsequent transportation.  Id. at ¶ 29.

These facts preclude Plaintiffs from seeking any relief under the FLSA, as such facts

establish that Plaintiffs fall under the FLSA's motor carrier exemption.  First, as drivers with

commercial drivers' licenses, Plaintiffs affect "the safe operation of motor vehicles on public

highways," such that they are regulated by the Secretary of Transportation.  See 29 U.S.C. §

213(b)(1) (providing that FLSA's motor carrier exemption applies to employees for whom "the

Secretary of Transportation has power to establish qualifications and maximum hours of

service"); Foxworthy, 997 F.2d at 672 (holding that, in order for motor carrier exemption to

apply, employee must move goods in interstate commerce and affect "the safe operation of

motor vehicles on public highways"); 29 C.F.R. § 782.2(b)(1) (providing that drivers are

employees who affect safe operation of motor vehicles on public highways).  Indeed, Decker's

truck drivers hold commercial drivers' licenses and are required to conduct pre-trip safety

inspections, and thus they are required to operate their trucks safely while performing their job

duties.

Furthermore, these facts satisfy the above-referenced factors that are considered by courts

when determining whether the intrastate transportation of goods to a warehouse is part of

interstate commerce, and hence subject to regulation by the Secretary of Transportation.   First,
even if New Belgium does not know the ultimate destination of specific shipments made to the
Rez, it "bases its determination of the total volume to be shipped through the warehouse on
projections of customer demand that have some factual basis," and "[t]he factual basis for
projecting customer demand may include . . . historic sales . . ., actual present orders, [or]
relevant market surveys." Surface Transportation Board Policy Statement, Ex-Parte No. MC-
207, 1992 WL 122949 (April 27, 1992).  Specifically, New Belgium uses a detailed forecasting
system to determine how much beer each of its out-of-state markets will require, and it bases its
beer production on such forecasts.  SOF at ¶¶ 20–27.  It then fine tunes its production of beer
based on orders that are received.  Id.  Thus, at the time Decker takes possession of beer for
shipment to the Rez, New Belgium has a "fixed and persistent intent" that the vast majority of
the beer shipped to the Rez will subsequently be shipped to interstate locations, as 89 percent of
all the beer that New Belgium produces is shipped to out-of-state markets.

In addition, with regard to the remaining factors identified above, no further processing
or substantial product modification occurs at the Rez, although repackaging or reconfiguring
may be performed, and, while in the warehouse, the beer is subject to the New Belgium's control
and direction as to the subsequent transportation.  SOF at ¶¶ 28–29.  Finally, once beer arrives at
the Rez, New Belgium uses modern warehouse management systems that track and document
most, if not all, of the shipments coming into and going out of the Rez.  Id. at ¶¶ 15–16.  In fact,
on occasion, beer transported by Decker employees to the Rez *is not stored at the warehouse at
all* – Decker's truck drivers sometimes ship beer to the Rez for an outbound, over-the road truck
waiting at the Rez's loading dock, the beer is off-loaded from the Decker truck, scanned into the

Rez's inventory, and then immediately loaded onto the outbound truck for further delivery to interstate or intrastate destinations.  SOF at ¶ 14.

Given these facts, Plaintiffs fall under the FLSA's motor carrier exemption.  See, *e.g.*, Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 898 (7th Cir. 2009) ("[W]hen a shipper transports his product across state lines for sale by him to customers in the destination state, and the product undergoes no alteration during its journey to the shipper's customer, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption from the Fair Labor Standards Act.").

Further, on the back end of the interstate beer distribution process, empty kegs, pallets, and packaging materials are back hauled to the Rez from out-of-state locations, and Decker's drivers then "back haul"  the material from the Rez to New Belgium's brewery.  Such back hauling, by itself, establishes that Plaintiffs are exempt employees under the FLSA.  See Foxworthy, 997 F.2d at 674  See also Bilyou v. Dutchess Beer Distribs., Inc., 300 F.3d 217, 224 (2d. Cir. 2002).  Accordingly, because Plaintiffs are not covered by the Act, their FLSA claim must be dismissed.[1]

---

[1] In addition, although Plaintiffs allege that they have not been properly paid under the FLSA for all work "at their straight time rate for work under and up to 40 hours of work per work week," such a claim is not cognizable.   The FLSA does not provide a cause of action for such "gap time" claims – *i.e.,* "those [claims] in which an employee has not worked 40 hours in a given week but seeks recovery of unpaid time worked, or in which an employee has worked over 40 hours in a given week but seeks recovery for unpaid work under 40 hours."  See Nakahata v. New York-Presbyterian Healthcare Sys., Inc., 2013 U.S. App. LEXIS 14128, *22 (2d. Cir. 2012); Robertson v. Bd. of County Comm'rs, 78 F. Supp.2d 1142, 1159 (D. Colo. 1999) ("[T]here is no requirement that an employer reimburse employees for 'gap' time.").  Even if a

III.    **Quasi-Estoppel Bars the Plaintiffs' FLSA claim.**

A.      **Applicable Law**.

Quasi-estoppel is a common law doctrine often referred to as a "species of equitable estoppel . . . which has its basis in election, waiver, acquiescence, or even acceptance of benefits and which precludes a party from asserting to another's disadvantage . . . a right inconsistent with a position previously taken by him." Soule v. Hilton Worldwide, Inc., 2014 U.S. Dist. LEXIS 25475, *54 (D. Haw. 2014) (noting, in addition, that quasi-estoppel "is based upon the broad equitable principle . . . that a person, with full knowledge of the facts, shall not be permitted to act in a manner inconsistent with his former position or conduct to the injury of another") (citations omitted).  Thus, quasi-estoppel must be applied when there is a showing that "the previous assertion of a position [is] so inconsistent with the one now taken as to make the present claim unconscionable." Wylie v. Marley Co., 891 F.2d 1463, 1470 (10th Cir. 1989) (citing Kansas law in diversity action).[2]  See also Farkas v. GMAC Mortgage, LLC, 737 F.3d 338, 343–44 (5th Cir. 2013) (applying quasi-estoppel to bar plaintiff's claims, noting that quasi-estoppel applies "when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit"); County Sch. Bd. of Henrico County v. RT, 433 F. Supp.2d 692, 705 (E.D. Va. 2006) ("In general, modern courts have held that quasi-estoppel applies when the offending party takes a different position than his or her original position and . . . it would be unconscionable to permit the

---

gap time claim were cognizable under the FLSA, Plaintiffs fail to state a claim for relief under the FLSA because, as explained above, they are not covered by the Act.

[2] Colorado courts also recognize the doctrine of quasi-estoppel.  See Italian Am. Bank of Denver v. Carosella, 254 P. 771, 776 (Colo. 1927); Alexander v. McClellan, 56 P.3d 102, 106 (Colo. App. 2002) (noting that quasi-estoppel prevents a party from taking inconsistent positions).

offending party to maintain an inconsistent position from which it has already derived a benefit or in which it has acquiesced.")  In other words, quasi-estoppel "stands for the proposition that 'one cannot blow both hot and cold.'"  Battelle Energy Alliance, LLC v. Southfork Security, Inc., 2014 U.S. Dist. LEXIS 33594, *22 (D. Idaho 2014).

Quasi-estoppel is not a true estoppel doctrine, however, as it does not require a showing that one party has induced the other to rely upon a misrepresentation to that party's detriment. See PACE Indus. Union-Management Fund v. Dannex Manuf. Co., 394 Fed. Appx. 188, 199 (6th Cir. 2010); Addicks Serv., Inc. v. GGP-Bridgeland, LP, 596 F.3d 286, 300 n.19 (5th Cir. 2010) ("[U]nlike equitable estoppel, quasi-estoppel requires no showing of misrepresentation or detrimental reliance.") (citation omitted); County Sch. Bd. of Henrico County, 433 F. Supp.2d at 705 ("As compared to equitable estoppel, quasi-estoppel does not require a showing of detrimental reliance.") (citing numerous cases).  "Instead, there must only be evidence that it would be unconscionable to permit the offending party to assert the allegedly contrary positions." County Sch. Bd. of Henrico County, 433 F. Supp.2d at 705.  Thus, although the quasi-estoppel doctrine bears an "estoppel" label, it is, in reality, a "waiver theory" because "like waiver, this doctrine focuses on the action of the individual who holds the right to determine whether it has been waived."  Zimmer v. Travelers Ins. Co., 454 F. Supp.2d 839, 859 (S.D. Iowa 2006) (discussing related doctrine of estoppel by acquiescence).  See also Mile High Indus. v. Cohen, 222 F.3d 845, 858 (10th Cir. 2000) (noting that, under related doctrine of estoppel by acquiescence, no showing of prejudice is required because the doctrine "focuses on the party against whom the defense is asserted to see if that party waived its right"); Rush v. Am. Home Mortgage, Inc., 2010 U.S. Dist. LEXIS 33630, *24–25 n.9 (D. Md. 2010) (noting that estoppel

by acquiescence "is [a] theory of quasi estoppel" which provides that "a party waives its ability to exert its rights when it has acquiesced to certain conduct or circumstances that abridged those rights for a period of time").

**B.** **Plaintiffs Are Estopped from Arguing that They Are Not Subject to Regulation by the Secretary of Transportation.**

On June 13, 2013, Plaintiffs' counsel, David Miller, filed an Unfair Labor Practice Charge against Decker with the NLRB, alleging that Decker violated Section 7 of the National Labor Relations Act ("NLRA") when it discharged Joe Griego, one of the Plaintiffs in this lawsuit, for engaging in protected concerted activity. See SOF at ¶ 30. Specifically, according to the Charge, several of the Plaintiffs in this lawsuit sought Mr. Miller's advice "to see if their failure to get overtime payment was a violation of the wage and hour laws" and, when Decker allegedly learned of this fact, it "fired the worker who was one of the lead organizers concerning the issues [*i.e.*, Mr. Griego]." Id. at ¶ 31. Notably, in the Charge, Mr. Miller identified himself as the Charging Party and, therefore, he filed the Charge on his own behalf, making himself a party and a witness. Id. at ¶ 32.

On August 20, 2013, Mr. Miller filed an Amended Charge with the Board, alleging additional unlawful conduct directed at other unidentified Decker employees. See SOF at ¶ 33. Again, he identified himself as the Charging Party. Id.

On September 18, 2013, the Board's General Counsel filed a Complaint and Notice of Hearing (hereinafter "Board Complaint") against Decker, based upon Mr. Miller's Charge and Amended Charge. See SOF at ¶ 34. However, on December 13, 2013, Mr. Miller filed a Second Amended Charge, which added an allegation that Decker disciplined Jennifer Johnson, another Plaintiff in this lawsuit, for engaging in protected concerted activities, in violation of the NLRA.

Id. at ¶ 35.  Thereafter, on January 31, 2014, the Board's General Counsel filed an Amended

Complaint and Notice of Hearing (hereinafter "Amended Board Complaint"), which added

allegations concerning Plaintiff Jennifer Johnson.  Id. at ¶ 36.  On April 8-10, 2014, and May 7-

8, 2014, a trial on the Charges and Board Complaints was held before one of the Board's

administrative law judges.  Id. at ¶ 37.

At trial in the case bearing his own name as the Charging Party, Mr. Miller entered his

appearance as counsel for the alleged discriminatees and Plaintiffs in this action, Mr. Griego and

Ms. Johnson.  See SOF at ¶¶ 38.  At trial, Decker maintained that both Mr. Griego and Ms.

Johnson were disciplined for legitimate, non-discriminatory reasons – failing to conduct "pre-

trip" inspections on their delivery vehicles, as required by the Federal Motor Carrier Safety

Regulations ("FMCSR") enforced by the Secretary of Transportation.  Id. at ¶¶ 38–39.  During

the course of trial, the Board's General Counsel asserted that Decker's reasons for disciplining

Mr. Griego and Ms. Johnson were merely a pretext, and Mr. Griego and Ms. Johnson were,

allegedly, disciplined by Decker for engaging in concerted activity protected under the NLRA

(namely, speaking to each other, other employees, and Mr. Miller about a potential wage

lawsuit).  Id. at ¶ 40.  In order to support its claim that Decker's reasons for disciplining Mr.

Griego and Ms. Johnson were pretextual, the Board's General Counsel argued that (1) Decker

and its drivers *are* subject to the Secretary of Transportation's FMCSR, which applies to

"employers, employees, and commercial motor vehicles [that] transport property or passengers

in interstate commerce," (2) that the FMCSR require drivers to do a pre-trip inspection, but (3)

failure to conduct a mandatory pre-trip inspection does not disqualify a driver from holding a

commercial drivers' license ("CDL").  Id. at ¶ 41.

14

Plaintiff Joe Griego adopted and supported these arguments by the Board's General Counsel. See SOF at ¶ 42. Specifically, while testifying as a witness at the hearing, Mr. Griego stated that the FMCSR applied to his work at Decker. Id. The Board's General Counsel then requested that the administrative law judge ("ALJ") take judicial notice of the fact that the FMCSR, which applies to employers and employees operating in interstate commerce, apply to Decker and its drivers, and the ALJ took such judicial notice. Id. at ¶ 43. Mr. Griego then specifically testified that the requirement for pre-trip inspections set forth in the FMSCR applied to his work at Decker. Id. at ¶ 44.

Mr. Griego delivered this testimony, under oath, in order to support the Unfair Labor Practice Charge.[3] Indeed, Mr. Griego also delivered this testimony for his own personal benefit, as the Board's General Counsel was seeking an order from the ALJ requiring Decker to reinstate Mr. Griego and "make him whole for any losses suffered." See SOF at ¶ 45. It would be unconscionable to allow Mr. Griego to now assert, in this case, a position completely inconsistent with his prior sworn testimony; i.e., it would be unconscionable to allow Mr. Griego to now allege that his work at Decker was not subject to regulations enforced by the Secretary of Transportation; simply because it is expedient for him to do so and allows him to assert an FLSA claim. Quasi-estoppel should be applied to bar Mr. Griego from disavowing his prior sworn testimony and, once quasi-estoppel is applied, the Court must find that Mr. Griego was an exempt employee under the FLSA's motor carrier exemption and dismiss his FLSA wage claim. Wylie, 891 F.2d at 1470 (noting that quasi-estoppel must be applied when there is a showing that

---

[3] Mr. Griego's testimony in this regard also happens to be truthful, as he (and the other Plaintiffs in this case) are, in fact, subject to regulations enforced by the Secretary of Transportation.

"the previous assertion of a position [is] so inconsistent with the one now taken as to make the present claim unconscionable").

Indeed, the FLSA claims asserted by the remaining Plaintiffs in this case must also be dismissed pursuant to the quasi-estoppel doctrine.  As a fact witness at the hearing *and* as counsel to (and a representative for) Mr. Griego and Ms. Johnson, Mr. Miller *never* objected to the ALJ taking judicial notice of the fact that the FMCSR apply to Decker and its drivers, and he *never* contested (as either a fact witness or a representative for the alleged discriminatees) that the FMCSR apply to Plaintiffs.  See SOF at ¶ 46.  Indeed, Mr. Miller *never* filed a post-trail brief (or, for that matter, any other motion) disputing the General Counsel's position that the alleged discriminatees (including those who are Plaintiffs in this case) are subject to regulations enforced by the Secretary of Transportation.  Id. at ¶ 47.  Like Mr. Griego, Mr. Miller – as both a party and fact witness and as representative of the alleges discriminatees – acquiesced to the General Counsel's position in order to support the General Counsel's Complaint and in order to advance the interests of Plaintiffs Griego and Johnson in the Board proceeding.  As with Mr. Griego, it would be unconscionable to allow Plaintiffs to now allege that their work at Decker was *not* subject to regulations enforced by the Secretary of Transportation.   Quasi-estoppel must be applied to bar Plaintiffs from disavowing their prior acquiescence to the General Counsel's argument that they *were* subject to regulation by the Secretary of Transportation and, with that issue being settled, the Court must find that Plaintiffs were exempt employees under the FLSA's motor carrier exemption and dismiss their FLSA wage claims.  See Farkas, 737 F.3d at 343–44 (applying quasi-estoppel to bar plaintiff's claims, noting that quasi-estoppel applies "when it

would be unconscionable to allow a person to maintain a position inconsistent with one *to which he acquiesced* . . . .") (emphasis added).

**IV.   Plaintiffs' State Law Claim Must Be Dismissed Because Defendant Is Not Subject to Colorado's Wage and Hour Law.**

Plaintiffs allege that Decker violated Colorado's Minimum Wage Order by failing to pay them for all time worked, including overtime, and by failing to provide paid 10-minute rest breaks.  See Am. Compl. at ¶¶ 45–47.  *This is simply a bad claim*.  Colorado's Minimum Wage Order only applies to certain industries, *none of which apply to Decker*.  See 7 Colo. Code Regs. § 1103-1:1.  See also Salazar v. Butterball, LLC, 644 F.3d 1130, 1144 (10th Cir. 2011) (noting that Colorado's Minimum Wage Oder only applies to the retail and service, food and beverage, commercial support service, and health and medical industries).  Accordingly, Plaintiffs' state law claim must be dismissed.  Even if not dismissed, however, this Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claim once it dismisses Plaintiffs' FLSA claim.  See 28 U.S.C. § 1367(c)(3) (providing that a court may decline to exercise supplemental jurisdiction over state law claims if the court "has dismissed all claims over which it has original jurisdiction").

## CONCLUSION

For all of the foregoing reasons, Defendant respectfully requests that the Court grant Defendant's Motion for Summary Judgment and award Defendant such other relief as the Court deems just and appropriate.

Respectfully submitted this 9th day of February, 2015.

/s *Matthew M. Morrison*

Emily F. Keimig
Matthew M. Morrison
SHERMAN & HOWARD L.L.C.
633 17th Street, Suite 3000
Denver, CO  80202
Tel.: 303-297-2900; Fax: 303-298-0940
E-mail:  ekeimig@shermanhoward.com
         mmorrison@shermanhoward.com

*Attorneys for Defendant*

### Certificate of Service (CM/ECF)

I hereby certify that on this 9th day of February, 2015, I electronically filed the foregoing **DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel for Plaintiffs at the following e-mail addresses:

David H. Miller, Esq.
Sawaya & Miller Law Firm
1600 Ogden Street
Denver, CO  80218
DMiller@sawayalaw.com


/s *Laura Lewis*